UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
KEITH JONES and
SHARON JONES,

                      Plaintiffs,                        **DECISION AND ORDER**
       -against-                                CV-04-1276 (JMA)

UNITED STATES OF AMERICA,

                      Defendant.
-------------------------------------------------------------X

APPEARANCES:

      G. Michael Simmon
      Weingrad & Weingrad, LLP
      350 Fifth Avenue
      Suite 7720
      New York, NY 10118
      *Attorney for Plaintiffs*

      Roslynn R. Mauskopf
      United States Attorney
      One Pierrepont Plaza
      Brooklyn, New York 11201
            *By:*    *Keisha-Ann Gray*
                  *Assistant United States Attorney*

**AZRACK, United States Magistrate Judge**:

      In this negligence action, brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680 ("FTCA"), plaintiff Keith Jones seeks to recover damages for physical injuries he allegedly sustained on January 26, 2000 during a motor vehicle accident that involved a car driven by an agent of the Federal Bureau of Investigations. Plaintiff alleges that, as a result of the car accident, he sustained "serious and severe personal injuries" as defined by the New York State No-Fault Law, N.Y. Ins. Law § 5102(d) (McKinney 2000) (Compl. ¶¶ 11-13). Plaintiff Sharon

Jones seeks to recover damages for loss of consortium and for the loss of her husband Keith Jones'

services, comfort, and companionship (Compl. ¶ 17).[1]

Pursuant to 28 U.S.C. § 636(c), the parties consented to me presiding over a non-jury trial

of this action.  On August 31, 2005, defendant informed the Court that it would not contest that the

government vehicle caused the January 26, 2000 accident.  The parties went to trial on all remaining

allegations of liability and damages.  Trial commenced on November 16, 2005, and was completed

on November 18, 2005.  Having reviewed the parties' submissions, the evidence presented at trial,

and assessed the credibility of the witnesses, I now set forth my findings of fact and conclusions of

law pursuant to Federal Rule of Civil Procedure 52.  For the reasons stated below, judgment is

granted to the United States.

## I.  FINDINGS OF FACT

A.  The Accident

The issue in this case is whether the January 26, 2000 car accident, caused by an FBI agent,

resulted in a serious injury to plaintiff Keith Jones as defined by New York State's No-Fault Law.

The accident occurred on Wednesday, January 26, 2000 at approximately 12:45 p.m. in the

westbound lane of the Long Island Expressway (Stipulated Facts, Proposed Joint Pre-Trial Order ¶ 1

("Stipulated Facts")).  The three vehicles involved are as follows: (1) a 1997 Oldsmobile Achieva,

driven by FBI Agent Jan Trigg; (2) a 1998 Chevy Blazer, driven by Steven Wallace, and (3) a 1999

Ford Expedition, driven by plaintiff Keith Jones (Stipulated Facts ¶¶ 2-3).  Agent Trigg's inability

---

[1] Plaintiff Sharon Jones' claims have no merit and will be briefly discussed below.
However, because I deem her claims to be without merit, all references to "plaintiff" are to Keith
Jones, unless specifically stated otherwise.

to stop the Achieva caused it to collide with the Blazer, which in turn made contact with the Expedition.

Steven Wallace ("Wallace"), the driver of the Chevy Blazer, testified as a non-party witness, and I find his testimony credible in its entirety. Wallace's Blazer was at a full stop prior to the impact from the Achieva, which was unable to break in the stop-and-go-traffic before hitting the Blazer from the rear (Trial Tr. 17:2-5, 18:10-13). Wallace testified that "[t]he front of [the Achieva] went underneath the tail of [his] car and that [the Blazer] took most of the impact" (Trial Tr. 17:5-7). The Blazer "skidded forward" and "kissed" the Expedition in front of it, which plaintiff Keith Jones was driving (Trial Tr. 17:7-8). Wallace described the impact between his Blazer and the Expedition as "soft" and likened it to a "kiss" (Trial Tr. 17:7-8). Because Wallace had his foot on the break, the Blazer "pushed" into the Expedition, and the impact was "not as strong as [Wallace] thought it might be" (Trial Tr. 18:18-20, 18:24-19:1). There was "very little" damage to the front of the Blazer, and Wallace observed "no visual damage" to the Expedition (Tr. 19:6-12). When plaintiff exited his vehicle, he did not appear injured to Wallace (Trial Tr. 21:17-21). Both Wallace and plaintiff drove away from the accident without any reported injuries (Trial Tr. 20:5-7, 22:3-8).

In addition, plaintiff Keith Jones testified that the only damage to the Expedition was a dent on the bumper and "a little in the door" (Trial Tr. 44:7-12, 44:16-17). While I find little of plaintiff's testimony credible, I do credit his testimony regarding the damage to the bumper because it is supported by other evidence. Plaintiff also testified that he felt "okay" after the accident and to "feeling pretty good at that time" (Trial Tr. 45:15-16). Additionally, he felt no pain in his neck or back after the accident (Trial Tr. 45:19-23), which is consistent with the fact that he left the scene of the accident without seeking medical treatment from the emergency personnel present.

The Expedition sustained a nominal amount of damage, which also supports my finding that the impact between the Expedition and the Blazer was slight – a mere "kiss." On February 1, 2000, Allstate Insurance Company estimated the total cost to repair the damaged Expedition to be $380.25, an amount which included both labor and taxes (Gov't Ex. R at 2083).

    B.    <u>Plaintiff Keith Jones' Injuries</u>

        1.    <u>Prior Disabilities</u>

The Social Security Administration and the Workers' Compensation Board deemed plaintiff Keith Jones totally disabled as the result of a knee injury on May 1, 1997, almost three years prior to the January 26, 2000 collision (Gov't Ex. Q at 1894; Trial Tr. 84:20-85:3). Plaintiff has collected Social Security benefits from November 1997 to the present (Gov't Ex. Q at 1894; Trial Tr. 91:19-92:15).[2]

Since his knee injury in 1997, plaintiff has been physically disabled. On February 4, 1999, plaintiff reported his daily activities as limited to self care, staying home to watch television and read, going to physical therapy, and some "limited" driving (Gov't Ex. G at 615; Trial Tr. 107:24-108:4, 109:9-21). His wife, plaintiff Sharon Jones, did the cooking, cleaning, and shopping (Gov't Ex. G at 615). Additionally, Mohammad Khattak, MD, who conducted the February 1999 examination for Diagnostic Health Services, Inc., found that plaintiff's ability to walk might be "limited due to the pain" (Gov't Ex. G at 616). By plaintiff's own admission, in May 1999, he could, at best, occasionally lift and/or carry "less than 10 pounds" and stand and/or walk for a total

---

[2] On June 21, 1999, the Social Security Administration mailed plaintiff a letter detailing his disability payout. He was to receive $4,808.00 on or around June 27, 1999 to cover retroactive disability payments as of November 1997. After that disbursement, he was to receive $261.00 on or about the fourth Wednesday of each month (Gov't Ex. Q at 1894).

of "less than 2 hours in an 8-hour workday," and sit for a total of "less than about 6 hours in an 8-hour workday" (Gov't Ex. Q at 2053; Trial Tr. 96:16-97:13).

Plaintiff had existing back and neck injuries prior to the January 2000 accident. In 1999, he sought medical care for problems he was experiencing with his cervical spine (Gov't Ex. O at 1772; Trial Tr. 224:25-227:10). On May 13, 1999, Mitchell Adler, MD diagnosed plaintiff with "mild degenerative disc disease at [the] C5 and C6" cervical vertebrae,[3] which is commonly known as arthritis (Gov't Ex. O at 1772; Trial Tr. 225:14-16). This part of the neck, which plaintiff claimed was injured in the January 2000 accident, was documented as causing plaintiff pain and discomfort almost a full year earlier (Trial Tr. 225:22-24). These degenerative changes in the cervical vertebrae were in the exact same location as plaintiff's subsequent disc herniation[4] (Trial Tr. 226:15-18).

During 1999, plaintiff's neck pain worsened, and he developed pain in his right arm, which included reported numbness and weakness (Trial Tr. 279:22-24). Dr. Adler referred plaintiff to a neurologist, Jeffrey L. Nelson, MD, who subsequently referred plaintiff for electrodiagnostic testing (Trail Tr. 279:20-280:1). On September 17, 1999, plaintiff was diagnosed with a herniated disc at C5-C6 of his cervical spine (Gov't Ex. O at 1771; Trial Tr. 224:4-20). The impression of plaintiff's

---

[3] The cervical spine is made up of seven vertebrae, commonly referred to as C1 through C7. C3 through C7 are similar in that they have interpretebral discs in between the pretebral bodies. Defendant's medical expert, Jonathan Garay, MD, described these bodies as the "shock absorbers of the spine . . . like a jelly donut. The jelly is the soft nucleus of the disc which helps support the spine and [is a] cushion for many forces" (Trial Tr. 274:12-20). The outer part of the disc is made up of the annulus, a "firmer, fibrous material which helps contain the nucleus within it" (Trial Tr. 274:20-23).

[4] A disk herniation or a ruptured disc is a break in the outer annulus where the inner part of the nucleus comes through. Dr. Garay analogized it to a "jelly donut that you squeezed" (Trial Tr. 275:5-9). A disk bulge is an asymmetry to the disc where it protrudes in one area, "like a water balloon that you squeeze but it didn't break" (Trial Tr. 275:11-13). A disk bulge can result from degenerative changes or from trauma (Trial Tr. 275:14-16).

cervical spine from the September 17, 1999 Magnetic Resonance Imaging ("MRI") revealed a "diffuse disc/ridge complex at C5-6 associated with a right lateral disc herniation, and deformity of the spinal cord" (Gov't Ex. O at 1771; Tr. 224:4-20).[5]

Only three months before the January 2000 car accident, Dr. Nelson recommended that plaintiff undergo neck surgery because a large C5, C6 disc ridge complex in his neck continued to cause him right arm pain (Gov't Ex. E at 342; Tr. 228:12-230:5). Dr. Nelson wrote to Dr. Adler on October 19, 1999 that plaintiff did "not want surgery" (Gov't Ex. E at 342).

Plaintiff has a history of back[6] and neck problems that predates the January 2000 accident (Trial Tr. 279:14-15). Notably, plaintiff received physical therapy for neck pain well before the accident (Trial Tr. 231:8-10) (emphasis added). The physical therapy records contain no report that plaintiff's neck pains were resolved (Trial Tr. 232:12-17). In fact, plaintiff's medical expert, Osric

---

[5] Dr. Garay explained the results of the September 1999 MRI as follows:

What you see is a loss of the normal cervical lordosis. There should be a curvature actually going this way as you see on the back of your neck. It's an opposite C-shaped curve. And, in fact, it curves the opposite direction at C5, 6. And there you have a large disc protrusion which is indenting the spinal cord.

You can see the contact it's making and sort of hour glass appearance of the spinal cord here. This is the spinal cord. You see the caliber of it and the arrows. And there's the disc at that level . . .

[Y]ou can again see this large disc ridge. It's almost obliterating the neural foramin on this side and it's greatly narrowed the size of the AP diameter of the spinal canal.

(Trial Tr. 282:11-283:4) (emphasis added).

[6] Plaintiff has complained of lower back pain for years and, prior to the January 2000 car accident, an orthopedist treated plaintiff for his lower back pain (Trial Tr. 279:15-18).

S. King, MD, confirmed that "there was no medical record that [Dr. King] reviewed that stated that [plaintiff's] symptoms [were] completely resolved with physical therapy (Trial Tr. 233:3-5).

On January 13, 2000, <u>only</u> thirteen days before the January 2000 car accident, plaintiff continued to receive physical therapy for his neck[7] (Trial Tr. 233:15-19). Plaintiff was discharged from physical therapy because he "chose to stop treatment" and not because he had "reached maximum benefit from supervised P[hysical] T[herapy]" (Gov't Ex. AA at GMS-2223). Additionally, plaintiff's stated goal for attending physical therapy, namely to achieve "full pain free use of C spine in four to six weeks" was not met (Trial Tr. 234:4-13). There is absolutely no evidence that plaintiff's neck pain was resolved before the January 26, 2000 car accident.

In May 1999, Dr. Russell Warren diagnosed plaintiff as disabled (Gov't Ex. Q at 1991, Trial Tr. 93:18-20). On December 21, 1999, plaintiff's physician, Steven Erlinger, recorded that "[plaintiff] <u>remains</u> totally disabled" (Gov't Ex. Q at 1982; Trial Tr. 93:13-17) (emphasis added). Thus, I find that plaintiff was completely and totally disabled before the January 2000 accident. Furthermore, it is my finding that plaintiff's back and neck injuries are attributable to both his knee injury,[8] and to other pre-existing degenerations in his cervical vertebrae, and are in no way attributable to the January 2000 accident.

---

[7] It should be noted that after January 13, 2000 there was only a brief time lapse before plaintiff continued his physical therapy treatments, as evidenced by Dr. King's remarks in a March 1, 2000 examination report, which noted results from a recent physical therapy session. This leads this Court to believe that plaintiff deliberately attempted to mislead the Court into concluding that the January 13 visit signified a resolution of plaintiff's physical therapy needs - a conclusion that would be completely groundless given all the evidence to the contrary, but particularly so, in light of the ongoing physical therapy sessions noted in later doctors' reports and notes. (See, e.g., Gov't Ex. J at 1085).

[8] According to Dr. Garay, "[a] severe knee problem which [] caus[es] limping and weakness in the legs for years can certainly [cause back injury]" (Trial Tr. 278:6-10).

## 2.    Disabilities After The Accident

The January 2000 accident did not change or exacerbate plaintiff Keith Jones' disabilities. Following the January 2000 accident, plaintiff retained all the abilities he reportedly possessed in 1999.  After January 2000, plaintiff was still able to watch television (Trial Tr. 109:22-25, 288:12-17).  He was still able to read (Trial Tr. 110:4-6, 288:22-24).  He was still able to take care of his personal hygiene (Trial Tr. 110:1-3, 288:18-21).  And lastly, after the accident, plaintiff was still able to drive (Trial Tr. 110:7-9, 289:1-8).

Plaintiff had no permanent injuries as a result of the January 2000 car accident, and any discomfort the accident directly caused was quickly resolved.  Five days after the January 26, 2000 accident, Dr. Adler found that plaintiff's pre-existing cervical radiculopathy had improved[9] (Gov't Ex. A at 59-60; Trial Tr. 251:7-252:2).  Thirty-four days after the January 26, 2000 accident, on March 1, 2000, Dr. King reported a "marked improvement" in plaintiff's symptoms and noted that plaintiff "feels that both areas in his lower and upper back are improving" (Gov't Ex. J at 1085). In addition, Dr. King noted that a report from the physical therapist "reveal[ed] that [plaintiff] is overall doing better with less spasm and pain and with less radicular signs" (Gov't Ex. J at 1085).

Unfortunately, little of Dr. King's trial testimony was helpful to this Court.  Dr. King's opinions regarding plaintiff's injuries were largely based on subjective findings[10] and information

---

[9] On January 31, 2000, plaintiff Keith Jones saw Dr. Adler.  Dr. Adler noted that Dr. Nelson believed plaintiff needed surgery on his neck and that the "patient, however, feels progress has been sufficient to forego surgery" (Gov't Ex. A at 59).  Dr. Adler noted that plaintiff Keith Jones complained that his "neck [was] somewhat more sore since [the] accident, but slowly improving since then" (Gov't Ex. A at 59).

[10] A subjective finding on examination is one in which there is some degree of patient participation (Trial Tr. 276:4-5).  An example is when the doctor, conducting a sensory examination, touches the patient and asks him to respond as to whether he feels pain or not (Trial

provided by plaintiff, which this Court finds in large part to be incredible.[11]  Because I find that any

information plaintiffs Keith Jones or Sharon Jones gave to any medical provider after the January

2000 car accident is suspect and likely an attempt to influence the doctors' diagnoses, I give far

more weight to objective medical findings.[12]  In addition, information that could have aided Dr. King

in forming a more accurate, informed opinion was withheld.  Dr. King admitted that if the patient

history that plaintiff provided was "incorrect, inaccurate or at the very least, incomplete, then his

_____

Tr. 276:5-7).  This involves the patient's full participation and "cognitive reasons" may make it impossible for the patient to "participate fully" (Trial Tr. 276:8-10).  Testing for numbness or tingling is mostly subjective, as is testing for weakness (Trial Tr. 277:2-13).

[11] Some of the findings upon which Dr. King opined, already questionable due to their subjective nature, are further discounted because Dr. King did not follow the correct procedures for proper diagnosis.  For example, Dr. King acknowledged that he diagnosed plaintiff with neck spasms without touching or examining him even though he admitted on cross examination that a medical diagnosis of neck spasms requires that a physician first conduct a palpatory "touching" examination of the patient (Trial Tr. 252:6-254:15) (emphasis added).  Additionally, Dr. King arrived at his opinion that plaintiff had neck spasms because plaintiff himself reported both spasms and headaches to Dr. King (Trial Tr. 253:6-23, 256:3-258:9) (emphasis added).

Dr. King had an incomplete medical history for plaintiff, as well.  When Dr. King attributed plaintiff's headaches to muscle spasms after the January 26, 2000 accident, he was unaware of the highly relevant and important medical information indicating that plaintiff suffered from severe migraine headaches dating back to the early 1990's (Trial Tr. 254:8-256:20).

Another example of an improper examination is Dr. King's February 9, 2001 diagnosis that plaintiff had myelopathy (Trial Tr. 258:14-18).  Dr. King admitted on cross-examination that he diagnosed plaintiff with myelopathy without ever making any of the underlying findings required for a clinical diagnosis of myelopathy.  (Trial Tr. 258:16-259:25).  In addition, Dr. Nelson fully examined plaintiff on March 27, 2000, and concluded that plaintiff had "no clinical evidence of myelopathy and the only residua of his right cervical radiculopathy is a slight right triceps weakness" (Gov't Ex. A at 78) (emphasis added).

[12] Objective findings greatly limit or alleviate the patient's participation (Trial Tr. 276:12-13).  Examples of objective tests are as follows: reflex tests, measuring atrophy, an MRI or an X-ray.

opinion that the January 26, 2000 accident caused plaintiff to suffer a 'serious injury' may also be incorrect" (Trial Tr. 222:18-22). Indeed, overall, plaintiff provided Dr. King with an incorrect, inaccurate and incomplete patient history. Thus, I conclude that Dr. King's testimony is of little assistance in determining the facts in this case.[13]

---

[13] The following omissions from plaintiff's medical history evince the incompleteness of the records that Dr. King reviewed:

Migraines

Plaintiff failed to provide Dr. King with his relevant past medical history of migraines (Trial Tr. 254:8-256:20).

X-Rays

Plaintiff failed to provide Dr. King with a May 1999 X-ray that reflected pre-existing arthritis at the exact area where plaintiff later developed pre-existing cervical radiculopathy – all of which are in the exact area that plaintiff claimed was subsequently injured by the January 26, 2000 accident (Trial Tr. 226:10-227:10) (emphasis added). Notably, Dr. King failed to consider in his reports or discuss on direct examination the highly relevant and important April 7, 2001 MRI, which demonstrated that plaintiff experienced no gross or measurable changes in his cervical spine from the time period prior to the January 26, 2000 accident (Gov't Ex. O at 1564; Trial Tr. 156:12-217:9, 218:16-219:21) (emphasis added).

Physical Therapy

Dr. King never considered plaintiff's physical therapy discharge summary, which reflected that plaintiff chose to stop treatment even though his neck pain symptoms had not been resolved (Trial Tr. 236:8-237:9 ). Dr. King based his medical opinion that plaintiff's symptoms completely resolved prior to January 26, 2000 accident on the fact that plaintiff told him that his symptoms had completely resolved prior to the accident (Trial Tr. 230:7-231:7) (emphasis added). Furthermore, Dr. King admitted that plaintiff's "[physical therapy] records are important because if plaintiff's symptoms had not been resolved with physical therapy, it may change his opinion on the cause and relationship between the January [2000] accident and plaintiff's symptoms" in this case (Trial Tr. 231:20-232:2).

Post January 2000 Accident Improvements

In addition, Dr. King failed to consider important medical information that 34 days after the accident, radicular signs in plaintiff's neck had subsided (Trial Tr. 241:7-22). Dr. King failed to

Based on objective findings and the credible testimony of the government's medical expert, Dr. Garay, plaintiff's degenerations of the cervical spine were unchanged after the January 2000 accident. More than one year after the accident, on April 7, 2001, another MRI was taken of plaintiff's cervical spine (Gov't Ex. O at 1564). The report is rife with language that connotes a lack of change in plaintiff's spine, such as "[e]xamination <u>once again</u> demonstrate[s] mild kyphotic curvature with apex at C5/C6 level. <u>Again</u> noted is a broad based central and right paracentral osteophytic ridges/disc at C5/C6 level. <u>Again</u> noted is a small right proximal foraminal soft disc herniation" (Gov't Ex. O at 1564) (emphasis added). Additionally, the impression from the 2001 MRI of plaintiff's neck revealed a "disc herniation at C5/C6 flattening the right ventral spinal cord, <u>grossly unchanged since 9/17/99</u>" (Gov't Ex. O at 1564; Trial Tr. 219:2-220:9) (emphasis added).

Dr. Garay opined with reasonable medical certainty that plaintiff's cervical spine remained unchanged from the time of the September 17, 1999 cervical MRI, which was prior to the accident, until the April 7, 2001 cervical MRI, which was taken after the accident (Trial Tr. 282:7-285:18).

In conclusion, I find that plaintiff was completely and totally disabled before the January 2000 accident. Furthermore, I find that the neck pain and degenerations from which plaintiff Keith Jones suffers were not caused by the January 2000 car accident, but instead are attributable to pre-existing degenerations in his cervical vertebrae.

---

consider highly relevant and important medical information that 127 days after the accident, plaintiff admitted that his neck and back symptoms were improving (Trial Tr. 249:25-251:6)

## II.  CONCLUSIONS OF LAW

This Court has subject matter jurisdiction over this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) ("FTCA").  The doctrine of sovereign immunity bars claims against the United States without its consent.  See United States v. Mitchell, 445 U.S. 535 (1980). Under the Federal Tort Claims Act, the federal government has consented to be sued for its employees' negligent acts or omissions, when acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1). In the instant case, the January 2000 car accident occurred in the westbound lane of the Long Island Expressway, near Utopia Parkway, New York (Trial Tr. 19:17-19); thus, New York law applies. See Goldstein v. United States, 9 F. Supp. 2d 175, 186 (E.D.N.Y. 1998) (applying New York law to an action brought under the Federal Tort Claims Act where the accident complained of occurred in New York); Kane v. United States, 189 F. Supp. 2d 40, 51 (S.D.N.Y. 2002) ("Pursuant to the FTCA, New York law governs with respect to the claim of negligence, the sole claim before the Court.").

### A.      Serious Injury Under New York's No-Fault Insurance Law

Plaintiffs' claims are governed by the New York "No-Fault" law, which precludes recovery for non-economic loss arising out of negligence in the use or operation of an automobile except where the claimant has a serious injury. N.Y. Ins. Law § 5102(a) (McKinney 2000).  Under the New York No-Fault Insurance Law, "Serious Injury" is defined as follows:

> A personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a

> medically determined injury or impairment of a non-permanent nature which
> prevents the injured person from performing substantially all of the material acts
> which constitute such person's usual and customary daily activities for not less than
> ninety days during the one hundred eighty days immediately following the
> occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d) (McKinney 2000). Any injury not falling into one of the above categories is considered a "minor" injury, and " the legislative intent underlying the No-Fault law was to weed out frivolous claims and limit recovery to significant injuries." Bruno v. Harmony, Inc., No. 1649/01, 2005 WL 2230397, at **2 (N.Y. City Civ. Ct. Sept. 13, 2005); see also Licari v. Elliot, 57 N.Y.2d 230, 236, 441 N.E.2d 1088, 1091, 455 N.Y.S.2d 570, 573, (1982). It is the court's responsibility to determine whether the plaintiff has suffered a "serious injury" within the meaning of the No-Fault statute. Id. at 237 (citing Hezekiah v. Williams, 81 A.D.2d 261, 440 N.Y.S.2d 274 (2d Dept. 1981)).

Plaintiff Keith Jones alleges that he suffered a "serious injury" in that he was "rendered sick, sore, lame and disabled; was caused to suffer great pain, discomfort, and disability and . . . will continue to suffer pain, discomfort, and disability in the future. . . ." (Comp. ¶ 13). Specifically, plaintiff claims he suffered the following serious injuries to his neck and back:

> an aggravation, activation and exacerbation of a pre-existing but quiescent cervical
> spine stenosis and herniation at the C5-C6 level, with neuropathology, right arm
> numbness, paresthesis and weakness; an activation and exacerbation of a pre-
> existing, but quiescent lumbar spine stenosis, with discogenic injury to the lumbo-
> sacral spine at L4-5 and L5-S1, with straining and spraining of muscles and
> ligaments of the lumbo-sacral spine superimposed on a pre-existing lumbar spine
> stenosis and facet hypertrophy, with neuropathology, with sciatica pain in right lower
> extremity, and weakness of gait. Plaintiff claims that his injuries are painful,
> permanent and permanently disabling; that the same impose significant limitations
> of function of the cervical spine, right shoulder, and right upper extremity, and of the
> lumbar spine, and of the right lower extremity; that he may need surgical
> decompression of the cervical spine (anterior cervical discetomy and fusion at C5-6),
> but that even with such surgery his symptoms of pain may persist because of
> irreversible nerve damage; and, that he requires ongoing therapy and other medical

and diagnostic care and treatment to maintain his present level of function, and to use his right arm.

(Pls.' Claims on Damages, Proposed Joint Pre-Trial Order ¶ 1 ("Pls.' Claims on Damages")). Based on the Complaint, the Proposed Joint Pre-trial Order, and trial testimony, plaintiff Keith Jones' complaints fall into three of the "serious injury" categories established by the legislature: (1) permanent loss of use of a body function or system; (2) significant limitation of use of a body function or system; and (3) an inability to perform customary and usual activities for not less than ninety of the one hundred and eighty days after the occurrence of injury (the "90/180 day rule").[14] I will discuss all three of these serious injury categories in turn and why I conclude that plaintiff's injuries fail to satisfy the legal standard for each of these categories.

### B.    Permanent Loss of Use of a Body Function or System

One way that a plaintiff can establish a prima facie case of serious injury, as defined by § 5102(d), is to demonstrate that his injury caused a permanent loss of use of a body function or system.  Plaintiff alleges that as a result of the January 2000 car accident, a previously "quiescent cervical spine stenosis and herniation at the C5-C6 level" and previously "quiescent lumbar spine stenosis, with discogenic injury to the lumbo-sacral spine at L4-5 and L5-S1" were permanently aggravated and exacerbated, causing permanent right arm numbness, paresthesis and weakness, sciatica pain in his right lower extremity, and a weakness of gait.  See Pls.' Claims on Damages ¶ 1 (emphasis added).  Plaintiff claims that his injuries are "painful, permanent and permanently disabling."  Id.

_____

[14] The January 26, 2000 accident did not cause any part of plaintiff's body to become dismembered, disfigured or fractured (Trial Tr.106:21-107:14, 287:9-20).  Furthermore, plaintiff did not lose a fetus or the use of any of his organs or members as a result of the January 2000 car accident (Trial Tr. 107:14-20, 110:10-13, 287:21-288:6).

Permanent injuries already in existence at the time of the car accident will not qualify as "serious injur[ies]." See Tornatore v. Haggerty, 307 A.D.2d 522, 763 N.Y.S.2d 344 (3d Dept. 2003). In Tornatore, the plaintiff was rear-ended and claimed serious injury in the form of permanent consequential limitation of use of a body organ or member, specifically that the whiplash injury aggravated his pre-existing degenerative arthritis and cervical spinal stenosis. Id. at 522-23. However, the evidence showed that the whiplash and its residual effects were "mild," and the court granted defendants summary judgment on the claim because plaintiff's medical records, submitted in support of the permanent injury claim, were "incomplete." Id. at 523. See also Houston v. Gajdos, 11 A.D.3d 514, 515, 782 N.Y.S.2d 839, 840 (2d Dept. 2004) (court granted defendant summary judgment because a credible reading of an MRI taken of plaintiff's cervical spine post-accident showed only pre-existing conditions and, consequently, plaintiff did not suffer a "serious injury"); Frank v. Jones, 259 A.D.2d 517, 686 N.Y.S.2d 110, 111 (2d Dept. 1999) (court granted defendants summary judgment because "mild stenosis and disc bulging suffered by the injured plaintiff were found by [defendant's] experts to be of such a nature that they must have pre-existed the accident"; thus, there was no "serious injury" as a result of the car accident).

Unfortunately for plaintiff, his medical records and the credible testimony elicited at trial simply do not support the claim that he suffered any permanent function or system losses in addition to the cervical and spinal damage he already sustained prior to the January 2000 accident. As discussed above, plaintiff had pre-existing degenerative disc disease at the C5-C6 cervical vertebrae and subsequently developed a disc herniation in that same location – all prior to the accident (Trial Tr. 225:14-16, 226:15-18). The 1999 MRI and the 2001 MRI, both of which Dr. Garay reviewed and opined upon in open court, demonstrated that plaintiff's cervical spine remained unchanged

from 1999 through 2001 (Trial Tr. 282:7-285:18). Thus, any permanent damage to plaintiff's cervical spine was not caused by the January 2000 car accident, and therefore does not fall within the permanent loss of use of a body function or system category of "serious injury" under § 5102(d).

A claim of permanent loss of use of a body function or system must be supported by medical records, and not based solely on plaintiff's testimony and subjective descriptions of pain. See Daviero v. Johnson, 110 Misc. 2d 381, 385, 441 N.Y.S.2d 895, 898 (Sup. Ct. 1981) (holding that, absent medical testimony, plaintiff's statement of pain alone was not sufficient to support a finding of permanency where the injuries in question are subjective in nature). See also Yanez v. City of New York, 29 F. Supp. 2d 100, 114 (E.D.N.Y. 1998) (where the chiropractic and MRI reports do not demonstrate that plaintiff's injuries caused a permanent loss of body function or system, plaintiff's subjective descriptions of pain will not do so in their stead).

While plaintiff and his expert, Dr. King, testified that plaintiff's pain and cervical vertebrae degenerations were cured through physical therapy prior to the January 2000 car accident, the objective medical evidence simply does not support that conclusion. See Hayes v. Johnston, 17 A.D.3d 853, 853-54, 794 N.Y.S.2d 462, 463 (3d Dept. 2005) (summary judgment granted because plaintiff failed to present objective evidence to counter the testimony of defendant's medical expert that plaintiff's "degenerative disc disease and mild disc bulging had preexisted the accident" and "that the accident had not caused or aggravated these conditions"). See also Frank, 259 A.D.2d at 517 (court granted defendants summary judgment based in part on the observations of defendants' experts that there was "no objective evidence of pain or loss of range of motion").

Additionally, the slight exacerbations to plaintiff's pre-existing injuries were, according to the objective medical record, not permanent in nature. The evidence proves that shortly after the

accident, plaintiff's additional pain steadily diminished through the passage of time and the aid of physical therapy (Trial Tr. 251:7-252:2; Gov't Ex. J at 1085) (only five days after the accident, plaintiff's discomforts had begun to resolve).

In <u>Dabiere v. Yager</u>, an examination of plaintiff by defendants' medical expert revealed preexisting "extensive degenerative arthritic changes in [his] neck and back, and that [he] had sustained several neck or back injuries prior to the accident." 297 A.D.2d 831, 832, 748 N.Y.S.2d 38, 39 (3d Dept. 2002). Defendants' expert opined that "although plaintiff may have suffered <u>minimal</u> soft tissue injury in the accident, the injury had healed and had <u>no lasting effect on the underlying degenerative arthritic process</u>." <u>Id.</u> (emphasis added). Plaintiff's expert in <u>Dabiere</u> opined that the accident "exacerbated . . . [a] preexisting degenerative condition, resulting in permanent pain which was unlikely to improve." <u>Id.</u> The court rejected that testimony because it was not supported by objective proof and, instead, granted defendants summary judgement, holding that "in the absence of objective evidence establishing the aggravation as opposed to the underlying condition [caused the permanent pain], plaintiff['s] submission is insufficient to demonstrate serious injury under the permanent loss of use . . . categor[y]." <u>Id.</u>

As in <u>Dabiere</u>, here plaintiff's claims that his permanent pain and loss of use of a body function or system are the result of the January 2000 accident and not the result of his pre-existing cervical spine damage are simply not supported by plaintiff's medical records or the credible testimony elicited at trial. <u>See also</u> <u>Rogers v. Chiarelli</u>, 10 A.D.3d 355, 356, 781 N.Y.S.2d 368 (2d Dept. 2004) (granting defendants summary judgment because plaintiff's physician failed to account for injuries to neck and back prior to the accident). Therefore, I conclude that plaintiff has failed to prove that he suffered a permanent loss of use of a body function or system as a result of the

January 2000 car accident.  Consequently, plaintiff has not suffered a "serious injury" under this category of § 5102(d), and the Court denies him judgment on this claim.

### C.  <u>Significant Limitation of Use of a Body Function or System</u>

Plaintiff's second claim of "serious injury" arises under the § 5102(d) category of "significant limitation of use of a body function or system."  Plaintiff asserts that the injuries for which he claimed permanent loss of use of a body function or system also

> impose significant limitations of function of the cervical spine, right shoulder, and right upper extremity, and of the lumbar spine, and of the right lower extremity; that he may need surgical decompression of the cervical spine (anterior cervical discetomy and fusion at C5-6), but that even with such surgery his symptoms of pain may persist because of irreversible nerve damage; and, that he requires ongoing therapy and other medical and diagnostic care and treatment to maintain his present level of function, and to use his right arm.

(Pls.' Claims on Damages ¶ 1).

A "significant limitation" is not the same as a "permanent injury."  The Second Department took great pains to flesh out the differences between these two categories of serious injury:

> The essential difference between these two types of "serious injury" is that the "significant limitation of use of a body function" does not require <u>permanence</u>, but instead requires a fact finding on the issue of whether the dysfunction is important enough to reach the level of <u>significance</u>.  Similarly, the "permanent loss . . . [of] a body . . . function" does not involve in any fashion the element of <u>significance</u>, but only that of <u>permanence</u>.  Indeed, if it did, there would be no need to list "significant limitation of use of a body function" in a separate category.

<u>Miller v. Miller</u>, 100 A.D.2d 577, 578, 473 N.Y.S.2d 513, 514 (2d Dept. 1984) (emphasis in original).  Thus, even if plaintiff suffered an injury that was not permanent in nature, if it is determined that he suffered a <u>significant</u> injury as a result of the January 2000 car accident then he could recover for a "serious injury."  This Court has previously extended the definition of "significant" to include "consequential" or "important." <u>Carter v. Atl. Greyhound Lines of VA, Inc.</u>,

No. 02-CV-0393, 2005 WL 1692639, at *7 (E.D.N.Y. July 5, 2005) (citing Toure v. Avis Rent A Car Sys., Inc., 98 N.Y.2d 345, 353, 774 N.E.2d 1197, 1201, 746 N.Y.S.2d 865, 869 (2002)). See also Licari, 57 N.Y.2d at 236 ("[T]he word 'significant' as used in [5102(d)] . . . should be construed to mean something more than a minor limitation of use. . . . [A] minor, mild or slight limitation of use should be classified as insignificant within the meaning of the statute.").

In determining whether an injury is "significant," the court must look to the "medical significance," of the injury, which "involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part.'" Carter, 2005 WL 1692639, at *7 (citing Toure, 98 N.Y.2d at 353 (emphasis added)). Like permanent injuries, objective medical findings are crucial for the court's proper determination of whether the injury imposes a "significant limitation." A plaintiff's description of his pain and suffering, standing alone without other objective indicia, cannot support a claim of significant limitation. See Scheer v. Koubek, 70 N.Y.2d 678, 679, 512 N.E.2d 309, 518 N.Y.S.2d 788 (1987) ("The subjective quality of plaintiff's transitory pain does not fall within the objective verbal definition of serious injury as contemplated by the No-Fault Insurance Law.") (emphasis added).

While plaintiff has significant limitations in his neck and back functions, they are not the result of the January 2000 car accident; rather, they emanate from pre-existing cervical vertebrae degenerations and a disc herniation. Plaintiff's pre-existing degenerative disc disease at the C5-C6 cervical vertebrae and subsequently developed disc herniation in that same location both cause significant limitations in the functions of plaintiff's neck and back; however these significant limitations existed prior to the accident (Trial Tr. 225:14-16, 226:15-18). The 1999 MRI and the 2001 MRI demonstrate that plaintiff's cervical spine remained unchanged from 1999 through 2001

19

(Trial Tr. 282:7-285:18). Thus, the January 2000 car accident did not cause any "significant limitation" to the functioning of plaintiff's cervical spine, and plaintiff's limitations do not fall within the "significant limitation of use of a body function or system" category of "serious injury" under § 5102(d).

Additionally, even if plaintiff's significant limitations of function of the cervical spine and its consequential effects on other parts of his upper body were exacerbated by the January 2000 accident, this Court, as fact finder, does not deem those exacerbations to be significant limitations. See Miller, 100 A.D.2d at 578 ("[T]he question of whether the injury is 'significant' . . . would ordinarily be a question of fact for the jury . . ."). As a result of the accident, plaintiff suffered minor soreness and quickly began to heel. A post-accident electromyogram showed "mild to moderate right cervical radiculophathy at the level of C6" (Trial Tr. 190:23-24, 191:19-20) (emphasis added). The objective evidence supports a finding that there was little, if any, change in plaintiff's neck and back functions. See Rhind v. Naylor, 187 A.D.2d 498, 498-99, 589 N.Y.S.2d 605, 606 (2d Dept. 1992) (finding that "mild" cervical and lumbar sprains are insignificant within the meaning of the No-Fault statute). The credible evidence presented at trial also indicates that the minor additional limitations plaintiff endured as a result of the accident quickly began to heal (Gov't Ex. J at 1085; Gov't Ex. A at 59-60; Trial Tr. 251:7-252:2). Plaintiff's medical expert, Dr. King, testified that plaintiff's injuries from the January 2000 accident were "very common in [that] . . . after an accident you usually feel a lot of pain and tenderness that limits . . . range of motion" (Trial Tr. 180:7-10). This testimony does not indicate a significant limitation, but rather describes the common irritation many individuals suffer after a car accident – whiplash.

While a "significant limitation" does not have to be permanent to qualify as such, its significance is measured in both "degree and duration." Gualtieri v. Farina, 283 F. Supp. 2d 917, 925 (S.D.N.Y. 2003); see also Partlow v. Meehan, 155 A.D.2d 647, 648, 548 N.Y.S.2d 239, 240 (2d Dept. 1989) ("[A]ny assessment of the 'significance' of a bodily limitation necessarily requires consideration not only of the extent or degree of the limitation, but of its duration as well."). Thus, the fact that the additional limitations to plaintiff's neck and back functions were both slight and short-term removes the limitations from the realm of "significant."[15]

Much of the Second Department case law discussing "significant limitation" under § 5102(d) involves a significant limitation in the plaintiff's range of motion. "New York courts have consistently held that 'a diagnosis of loss of range of motion, because it is dependent on the patient's subjective expressions of pain, is insufficient to support an objective finding of serious injury.'" Hodder v. United States, 328 F. Supp. 2d 335, 349, 352-53, 358 (E.D.N.Y. 2004) (court rejected plaintiff's loss of range of motion, in part, because it was found that limited range of motion in the

---

[15] While plaintiff's disc herniation pre-dated the accident, even if the accident aggravated it, courts have rarely found that a disc herniation constitutes a "significant limitation" or a "serious injury." Guzman v. Paul Michael Mgmt., 266 A.D.2d 508, 509, 298 N.Y.S.2d 719 (2d Dept. 1999). See, e.g., Howell v. Reupke, 16 A.D.3d 377, 790 N.Y.S.2d 703, 704 (2d Dept. 2005) ("The mere existence of a bulging or herniated disc is not conclusive evidence of a serious injury in the absence of any objective evidence of a related disability or restriction."); Ceglian v. Chan, 283 A.D.2d 536, 724 N.Y.S.2d 762, 763 (2d Dept. 2001) (disc herniations and bulging discs "alone do not constitute serious injury").

In Gualtieri, the court noted that "herniated or bulging discs do not per se meet the statutory threshold of serious physical injury without objective evidence of the extent or degree of the alleged physical limitations resulting from the injuries and their duration." 283 F. Supp. 2d at 925 (internal quotations omitted) (citing Rose v. Furgerson, 281 A.D.2d 857, 859, 721 N.Y.S.2d 873 (3d Dept. 2001)). Here, plaintiff's limitations pre-dated the January 2000 car accident, and what little strain the slight whiplash may have caused was of short duration. Consequently, plaintiff's herniated disc did not result in a "significant limitation" under this standard.

neck was due, not to the accident, but rather, to "the bone spurs that were evidence of an already existing, long-standing condition in her spine . . .") (citing Gillick v. Knightes, 279 A.D.2d 752, 719 N.Y.S.2d 335, 336 (3d Dept. 2001)). In determining whether plaintiff's post-accident range of motion amounts to a "significant limitation" the court must make "a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part." Bewry v. Colonial Freight Sys., No. 01-CV-5634, 2002 WL 31834434, at *3 (S.D.N.Y. Dec. 17, 2002) (internal quotations omitted). Plaintiff introduced no evidence at trial regarding his pre-accident range of motion, other than self-serving testimony that he did not have the same limitations in his neck's range of motion prior to the January 2000 car accident and that in 1999 his neck "felt great" (Trial Tr. 38:11-20). However, the credible evidence at trial establishes that plaintiff experienced neck pain and range of motion limitation one year before the accident (Trial Tr. 228:12-230:5, 231:8-10, 279:22-24; Gov't Ex. E at 342).

Without having treated plaintiff at any time prior to the January 2000 car accident, plaintiff's medical expert, Dr. King, offered testimony regarding plaintiff's post-accident range of motion (Trial Tr. 168:18-21, 175:16-22, 179:19-20, 180:7-10, 193:20-195:13). This testimony, however, was unpersuasive for three reasons.

First, much of Dr. King's findings regarding plaintiff's range of motion were based on subjective tests,[16] in which the plaintiff had some or total control over his range of motion. Even

_____

[16] Dr. King admitted that the tests he conducted on plaintiff resulted, in large part, in subjective findings.

> Range of motion testing involves two parts; a passive part and an active part. The active part incorporates you asking the patient to move and he stopping where the pain is too much for him to move further or where he feels a limitation. The passive

though Dr. King did conduct objective tests to determine plaintiff's range of motion, referring to plaintiff's participation as "passive" (Trial Tr. 175:16-22), courts in the past have been skeptical of classifying range of motion tests as "objective findings" because they heavily rely on the plaintiff's indications of pain. See Hodder, 328 F. Supp. 2d at 355 ("[T]he fact is that most doctors will stop moving the patient once the patient begins to complain of pain, whether truthful or not. Thus, courts have required that the physician conduct objective range of motion tests, and quantify the results of the range of motion tests.") (citations omitted).

Dr. King testified that "[o]n examination, [he] found Mr. Jones to have limited range of motion in degrees of bending down or flexion or extension as well as turning to the right and left or described as rotation" (Trial Tr. 168:18-21). However, I do not credit any range of motion testimony elicited from plaintiff. Even though some of the quantified ranges were based on "passive" and "objective" findings, they were both influenced in part by plaintiff and are otherwise deemed insufficient to establish plaintiff's limits in range of motion were the result of the January 2000 accident. Plaintiff had control over his range of motion and the objective evidence, such as the X-Rays and MRIs, does not show that the accident further aggravated plaintiff's degenerations and injuries. Thus, this Court finds no basis for the cervical extension ranges to which Dr. King testified. See Byrne v. Oester Trucking, Inc., 386 F. Supp. 2d 386, 393 (S.D.N.Y. 2005) (court credited range of motion testimony because it was supported by other "objective medical evidence," such as an MRI); Coloquhoun v. 5 Towns Ambulette, Inc., 280 A.D.2d 512, 720 N.Y.S.2d 385, 386

---

part consists of myself or a clinician holding the patient's head or neck and moving until you feel some resistance.

(Trial Tr. 175:16-22).

(2d Dept. 2001) (granting defendants' summary judgment motion because "plaintiff's treating physician failed to provide objective evidence of the extent or degree of the alleged physical limitations of the plaintiff's leg or arm that were caused by the subject accident"). See also Williams v. Ritchie, 139 F. Supp. 2d 330, 340 (E.D.N.Y. 2001) (a showing of significant limitation can be established through "objective tests performed to determine such restriction of movement") (citing Merisca v. Alford, 243 A.D.2d 613, 614, 663 N.Y.S.2d 853, 854 (2d Dept. 1997)). "Subjective complaints of pain are insufficient to establish a 'significant limitation' unless accompanied by objective, medical evidence of the extent or degree of the limitation and its duration." Williams, 139 F. Supp. 2d at 340. Dr. King failed to establish credibly, nor did plaintiff offer any evidence to support, that he "relied upon objective, rather than subjective, medical tests in arriving at his conclusions." Raugalas v. Chase Manhattan Corp., 305 A.D.2d 654, 655, 760 N.Y.S.2d 204, 206 (2d Dept. 2003).

The second reason Dr. King's testimony is unpersuasive is because he failed to test plaintiff's range of motion during his first visit, immediately following the January 2000 accident. During the February 7, 2000 examination, "[Dr. King] did not make any specific description of [plaintiff's] range of motion in his cervical spine" (Trial Tr. 179:14-20). Dr. King did not examine plaintiff's range of motion until months after the January 2000 accident (Trial Tr. 192:18-193:2) and, while he opined that plaintiff had only 15 degrees of cervical extension with pain[17] and 75 degrees of

---

[17] The normal range for a cervical extension is, according to Dr. King, 45 degrees (Trial Tr. 193:7-8). In Bewry, the court listed the "normal" range for a cervical extension as 60 degrees. 2002 WL 31834434 at *4. Plaintiff Bewry had a range of 25, and the court found that to be a significant limitation. Id. In the present case, however, there is no evidence that plaintiff had more than a 15 degree cervical extension prior to the accident, and, in light of his medical history of degenerative cervical vertebrae and disc herniation, this Court finds that his range of motion limitations pre-dated the January 2000 accident. Of course, this Court remains skeptical

cervical rotation,[18] neither he nor plaintiff offered any evidence that plaintiff had a normal range of

motion before the accident. Because Dr. King had no first-hand knowledge of plaintiff's pre-

accident range of motion, his testimony that plaintiff's range of motion limitations resulted from the

January 2000 car accident is "sheer speculation." See Correa v. City of New York, 18 A.D.3d 418,

420, 794 N.Y.S.2d 408, 410 (2d Dept. 2005).

Finally, I reject Dr. King's testimony regarding plaintiff's range of motion because it was

confused, garbled, and at times, incoherent. At various points, it was unclear whether Dr. King

accurately recalled testing plaintiff's range of motion or the test results.[19] In Grossman v. Wright,

---

of the accuracy of these range-of-motion-test-results because of their subjective nature, as noted
above.

[18] The normal range for a cervical rotation is 80 degrees (Trial Tr. 193:24). In Bewry, the
plaintiff had a right and left cervical rotation of 55 degrees. 2002 WL 3184434 at *4. The court
found this to be evidence of significant limitation. Again, in the present case, there is no
evidence that plaintiff had more than a 75 degree cervical extension prior to the accident, and, in
light of his medical history of degenerative cervical vertebrae and disc herniation, this Court
finds that his range of motion limitations pre-dated the January 2000 accident. Additionally, this
court is not persuaded that a 75 degree cervical extension, even if sustained as a result of the
January 2000 car accident, which this Court clearly does not find, is a significant limitation. See
Waldman v. Chang, 175 A.D.2d 204, 572 N.Y.S.2d 79, 80 (2d Dept. 1991) (holding as a matter
of law that plaintiff's 15% limitation in range of motion of cervical spine is not "significant"
within the meaning of the statute).

[19] Dr. King's direct testimony was confused to the verge of incomprehensible when
explaining his observations and understanding of plaintiff's range of motion:

Q:      Did you find cervical rotation to be limited in any degree?
A:      Yes, it was limited to approximately 75 degrees.
Q:      And what is normal?
A:      Eighty degrees.
Q:      With respect to –
        THE COURT:          Show me 75 degrees and show me 80.
        THE WITNESS:        Seventy-five. Eighty.
Q:      Now, can you show us fifteen degrees and 45 degrees?
A:      Fifteen degrees would be about here. Eighty would be all the way
        back.

the Second Department, granting summary judgment for defendants, rejected plaintiff's attempt to prove a triable issue of "serious injury," finding that, "[t]he mere parroting of language tailored to meet statutory requirements is insufficient." 268 A.D.2d 79, 83-84, 707 N.Y.S.2d 233, 236-37 (2d Dept. 2000) ("summary judgment should be granted in cases where the plaintiff's opposition is limited to 'conclusory assertions tailored to meet statutory requirements'") (citing Lopez v. Senatore, 65 N.Y.2d 1017, 1019, 484 N.E.2d 130, 131, 494 N.Y.S.2d 101, 102 (1985)). See also Pinales v. CSC Holdings, Inc., No. 17002/00, 2002 WL 31355602 (Sup. Ct. Sept. 30, 2002) (medical

---

|       | THE COURT: I think he said – Did you say 80 or 45? |
|-------|----------------------------------------------------|
| Q: | I said – Well, according to the report, unless I misread it, fifteen degrees with pain, forty-five degrees is normal. |
| A: | Right. So, he's slightly able to look up this way. Eighty degrees would be completely back. |
| Q: | Did you do – |
|    | DEF.'S COUNSEL: Excuse me, your Honor. I thought that counsel asked for 45 degrees. |
|    | THE COURT: He did. |
|    | PLS.' COUNSEL: I didn't ask for 45. I just referred to the report at 45. |
|    | THE COURT: No, you asked for 45. I think he did 85. Show me 45. |
|    | THE WITNESS: Okay. Alright, 45 degrees of range of motion – We're talking about extension? |
|    | THE COURT: Yes, that's what I thought. |
|    | PLS.' COUNSEL: No, cervical – Yes, cervical extension. Cervical extension, yes. |
| A: | Cervical extension, 45 degrees. If this is all the way back, it would be approximately right here. |
|    | THE COURT: That's forty-five? |
|    | THE WITNESS: Yes. But, again, it's impossible for me to see what I look like at 45 degrees. |
|    | THE COURT: You know better than me. |
|    | THE WITNESS: I would be able to look at you and tell you whether your neck is at 45 degrees or 75. But, looking at myself, I can't see myself. |

(Trial Tr. 193:20-195:13).

expert's "report must offer more than a reiteration of the plaintiff's subjective complaints or the physician's subjective observations and <u>conclusory</u> opinions." The finding will be "insufficient, unless the physician also indicates what tests or methods, if any, were relied upon for measuring and verifying the degrees recorded") (emphasis added).

Finally, I reject plaintiff's claim for "significant limitation" because defendant's medical expert, Dr. Garay, credibly opined that he did not believe, based upon his medical examination, that plaintiff had significant limitations in range of motion (Trial Tr.286:23-287:8). Dr. Garay also testified that he believed plaintiff attempted to limit his range of motion during the examination (Trial Tr. 286:22-287:8). Dr. Garay testified that

> [w]hen [he] initially examined Mr. Jones, there was restricted motion both actively and passively. But [Dr. Garay] could palpate Mr. Jones voluntary contracting his muscles in his neck resisting his motion. And then during both distraction and indirect examination . . . when [he] was examining [plaintiff's] ears prior to that and . . . asked him to turn his head he was able to rotate fully. When [Dr. Garay] observed him when [he] was not examining [plaintiff] both in the waiting room and in the office . . . [he] observed [plaintiff] turning his head freely.

(Trial Tr. 286:23-287:8). Factually similar, in <u>Hodder</u>, the defense medical expert, Dr. Goldberg, questioned the sincerity of plaintiff's reports of pain,

> noting that during the examination, she complained of pain upon motion of her left shoulder. However, after she left the examining room, when she may have believed she was no longer under the doctor's observation, Dr. Goldberg saw her putting on her coat in the waiting room, raising her hands overhead, straightening her arms and using her arms and shoulders in ways that far exceeded anything she would do or would allow Dr. Goldberg to do to her during the examination.

328 F. Supp. 2d at 352 (citations omitted). In <u>Hodder</u>, the court completely credited Dr. Goldberg's testimony. <u>Id.</u> at 358. Like the court in <u>Hodder</u>, I completely credit Dr. Garay's testimony that plaintiff did not exhibit the same limitations in his range of motion when he believed that he was not under Dr. Garay's observation.

Plaintiff's medical record clearly establishes that before the January 2000 accident he had both permanent injuries and significant limitations in his neck and back functions, namely pain and limitations in range of motion. The objective medical evidence, however, does not support any claim that his limitations of the cervical spine were in any way caused by the accident. Therefore, I conclude that plaintiff has failed to prove that he suffered a significant limitation of use of a body function or system as a result of the January 2000 car accident. Consequently, plaintiff has not suffered a "severe injury" under this category of § 5102(d), and the Court denies him judgment on this claim.

### D.    Prevention of Performing Usual and Customary Activities

Plaintiff's remaining claim of serious injury falls under the 90/180 day rule in § 5102(d). To succeed, plaintiff must demonstrate that he was restricted in performing substantially all of the material acts that constitute his usual and customary activities for ninety out of the one hundred and eighty days following injury. N.Y. Ins. Law § 5102(d). However, using this criteria, plaintiff falls woefully short of demonstrating a serious injury under New York law.

The words "substantially all" should be

construed to mean that the person has been curtailed from performing his <u>usual activities to a great extent rather than some slight curtailment</u>. As to the statutory 90/180- day period of disability requirement, it should be considered a necessary condition to the application of the statute. Where the statute is specific, as it is here, that the period of disability must be for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment, the Legislature has made it abundantly clear that disability falling within this threshold period must be proved along with the other statutory requirements in order to establish a prima facie case of serious injury.

Licari, 57 N.Y.2d at 236 (emphasis added) (internal quotation marks omitted).

Plaintiff filed for disability prior to the January 2000 car accident, and, in 1999, the Social Security Administration and the Workers' Compensation Board deemed him totally disabled as the result of a knee injury on May 1, 1997 (Gov't Ex. Q at 1894; Trial Tr. 84:20-85:3). To qualify for disability, on February 4, 1999, plaintiff reported his daily activities as limited to self care, staying home to watch television and read, going to physical therapy, and some "limited" driving (Gov't Ex. G at 615; Trial Tr. 107:24-108:2, 109:9-21). These were plaintiff's "usual and customary activities." See N.Y. Ins. Law § 5102(d). At the time he sought disability, plaintiff reported that his wife, Sharon Jones, did the cooking, cleaning, and shopping (Gov't Ex. G at 615).

At trial, plaintiff admitted on cross-examination, and Dr. Garay confirmed, that after the January 2000 accident plaintiff still could watch television (Trial Tr. 109:22-25, 288:12-17), read (Trial Tr. 110:4-6, 288:22-24), take care of his personal hygiene (Trial Tr. 110:1-3, 288:18-21), and drive (Trial Tr. 110:7-9, 289:1-8). Following the January 2000 accident, plaintiff retained all the abilities he reportedly possessed in 1999.

Plaintiff attempted at trial to expand upon his pre-accident activities. He testified that his wife did not actually do all the cooking and cleaning before the accident, but rather that he assisted in both of these activities while his wife worked full-time (Trial Tr. 58:22-59:7). Plaintiff testified that he cleaned the house, swept the floor, washed dishes, and did "light cooking" (Trial Tr. 59:3-7). Plaintiff also testified that he helped in the care-taking of his wife's autistic son (Trial Tr. 54:20-57:11). He testified that before the accident he went shopping, to the movies, plays, and on vacation with his family (Trial Tr. 58:17-21). Plaintiff, Sharon Jones, also testified to an expanded account of her husband's pre-accident activities; and, although she attempted to minimize the amount of work her husband did around the house, so as to conform with the limitations he reported to the

disability board, she nonetheless testified to activities beyond the scope of those reported in 1999 (Trial Tr. 114:14-115:16).[20]

Plaintiff Keith Jones' testimony, expanding his pre-accident activities, is completely self-serving, and there is absolutely no credible or objective evidence to support his claim that his usual and customary activities for ninety out of the one hundred and eighty days following his injury were curtailed or impeded in any way. See Howell, 16 A.D.3d at 378 (court rejected plaintiff's 90/180 day claim because "plaintiff did not submit any competent medical evidence that she was unable to perform substantially all of her daily activities for not less than 90 of the first 180 days after the accident as a result of the accident"). See also Williams, 139 F. Supp. 2d at 342 (court granted defendant summary judgment because plaintiff failed to offer any "objective medical evidence to support [her] assertion" that she was unable to care for her mother, take long walks with neighbors, or perform household chores and yard work for 90 of the first 180 days following the accident); Carter, 2005 WL 1692639 at *8-9 (granting defendants summary judgment on plaintiff's claim of "impairment for 90-out-of-180 days" because "plaintiff provide[d] no details of any inability to perform any of her usual activities").

Plaintiff was diagnosed as completely disabled in 1999, and his activities were extremely limited. Because of his diagnosis as disabled, plaintiff was able to collect disability for his 1997 knee injury. Plaintiff's attempt to expand his activities is either a fraud on the Social Security Administration and Workers' Compensation Board or a fraud upon this Court. The activities

---

[20] It must be noted that this Court has deemed plaintiff Sharon Jones' testimony to be completely incredible, "not worthy of belief" and has rejected it "in total" (Trial Tr. 318:18-20). Her testimony has had no influence on the findings of fact and provides no support for plaintiff Keith Jones' claims of serious injury.

plaintiff testified to are not consistent with the activities he reported in 1999. Therefore, I conclude that plaintiff has failed to prove that he was restricted in performing substantially all of the material acts which constitute his usual and customary activities for ninety out of the one hundred and eighty days following injury as a result of the January 2000 car accident. Consequently, plaintiff has not suffered a "severe injury" under this category of § 5102(d).

## III. CONCLUSION

"As in any other negligence case, [a] plaintiff ha[s] the burden of establishing causation as an element of his prima facie case under Insurance Law § 5102." O'Donnell v. United States, No. 94-CV-6820, 1998 WL 603214, at *3 (S.D.N.Y. Sept. 11, 1998) (citing Wood v. Hein Trucking Corp., 115 A.D.2d 181, 182, 495 N.Y.S.2d 251, 252 (3d Dept. 1985)). In this case, plaintiff's attempt to connect his C5-C6 herniation to the January 2000 accident is unavailing. See Bucci v. Kempinski, 273 A.D.2d 333, 709 N.Y.S.2d 595, 596 (2d Dept. 2000) (plaintiff's MRI "indicating that he exhibited a 'slight posterior disc bulge' in the cervical spine'" was insufficient to "causally relate[] the bulge to the accident"). Plaintiff has failed to satisfy his burden that as a result of that accident he suffered a serious injury under the New York State No-Fault Law § 5102(d), namely he has failed to prove that he suffered a "permanent loss of use of a body function or system," a "significant limitation of use of a body function or system," or was "prevent[ed] [from] performing [his] usual and customary activities." Plaintiff has failed to provide "competent proof connecting [his injuries] . . . to the accident . . . ." Rose, 281 A.D.2d at 859. Thus, he has failed to prove causation.

Additionally, plaintiff Sharon Jones, has failed to establish a loss of consortium claim. It is well settled under New York law that a claim for loss of consortium "is a derivative action and, as

such, its viability is dependent on the viability of a primary cause of action . . . ." Panczykowski v. Laborers Int'l Union of N. Am., No. 97-CV-036A, 2000 WL 387602, at *14 (W.D.N.Y. Mar. 31, 2000) (citations omitted).  See Maddox v. City of New York, 108 A.D.2d 42, 487 N.Y.S.2d 354 (2d Dept. 1985), aff'd 66 N.Y.2d 270, 487 N.E.2d 553, 496 N.Y.S.2d 726 (1985).  Because Keith Jones' claim is denied and judgment is granted for the government, it follows that Sharon Jones' claim is also denied and judgment is granted for the government.

For the foregoing reasons, I find that, based on a preponderance of the evidence, plaintiff Keith Jones has failed to make out a claim for "serious injury" under the New York State No-Fault Law § 5102(d).  It is hereby ordered that judgment on all claims be entered in favor of defendant, the United States.


SO ORDERED.

Dated: January 9, 2006
        Brooklyn, New York

                                        __/s/_____
                                        JOAN M. AZRACK
                                        UNITED STATES MAGISTRATE JUDGE